If it may please the court, my name is Ed Sheehy Jr. I'm the attorney representing Justin Gamba, the defendant and appellant, and then of course the cross-appellee on the two issues raised by the government. And with regard to the time for argument today, I'd like to spend ten minutes of my time dealing with the issue we've raised on appeal and then reserve the remaining time to deal with the government's issues. Mr. Gamba is appealing to this court from his conviction on count three of the superseding indictment of tampering with a witness. And it is our position on appeal that the district court erred in denying our motion for judgment of acquittal or, alternatively, that the evidence is not sufficient to sustain that conviction. Now, as the court knows, the standard for review here is the evidence has got to be looked at in a light most favorable to the government. And when that is done, we have to look at the two elements of tampering, which require that a defendant knowingly used intimidation, and in this case, knowingly used it against Tiffany Wadman, and secondly, that he did so with an intent to prevent or delay her testimony in the case of United States v. Breland, which was a drug case pending in the same district court in Montana. Now, with regard to intimidation, what the jury was told is that someone has to intentionally said or did something that would cause someone to be fearful of harm to himself or to another. And it's our position in this case that we don't have any intimidation of Tiffany Wadman. With regard to that first element, there has to be intimidation used. And in this case, at best, you can say, even viewing the evidence in light most favorable to the government, that there was some type of indirect threat, because the threat was that if something happens to me, meaning Mr. Gamba, that she somehow was going to be harmed. There was certainly not too subtle threats about, are you a friend of her and were anyone who ratted belongs in a ditch and so on and so on. Why is that good or no? Well, there were, yes, she said that anyone that ratted belonged in a ditch, but she said that he wavered on that as far as directing it toward her. And when she was asked on redirect by the government, she said that all of these threats to her were indirect, that there was no direct threat of harm to herself. And this is similar to actually the threats that were made allegedly to Teresa Clark that the Court did grant a judgment of acquittal on, because the Court, in granting it, said it was indirectly implied. There was never a direct threat. It was that he was angry, he knew people. And that's set out in our excerpts on pages 65 and 66, where the Court made those comments, and that's why it was granting a judgment of acquittal as to count four, which pertained to Teresa Clark. None of these comments are, if you testify against Kathy, I'll kill you, which I think you would conceive would be a threat. That would be a threat, yes. They're all what the Latin scholars call indirect discourse, right? Yes. Couldn't the jury fairly infer from the Wadman conversations that that's exactly what was intended? I don't believe they could. What do you think winding up in a ditch means? I'm not sure what it means. She wasn't even sure what it means. Isn't it entirely possible that he meant to convey that she would be hurt? That may be the case, but if he had said, if you testify against Kathy, you'll wind up in a ditch, would that have been enough? Oh, that certainly would have been enough. That's a direct threat. The difference is he's sort of saying into the air in her presence, you know, I know people who have ratted Kathy out and they've wound up in a ditch. I don't think he ever said that, that he knew people that ratted her out and made him testify. He testified that Gamba told her that he had told several of his friends that she was not Breland's friend, but did not tell her anything about who the friends were. She presumed taking care of meant that she would be hurt. She also said Gamba referred to other people who had ratted on Breland and would be taken care of, and these people would wind up in ditches. Is that about right? That's right. And your argument is that the jury could not infer a threat from that? Not a threat within the meaning of intimidation. But even if you can somehow say they could infer a threat, we still have the second element, that it was done with an intent to prevent or delay her testimony in the Breland case. And that's where we rely upon the Baldiga decision and the Victor decision, where certainly it could be inferred, based on what happened to the victims in those cases, that there was an intent to prevent that person from further talking to the government. I have a little trouble understanding how those cases helped you, because they were extreme, like this Baldiga, you know, the gun to the head. Right. We'd all agree if you hold a gun to somebody's head, they might get a message, right? Yep. But you don't need to go as far as holding a gun to somebody's head in order to intimidate a witness, do you? I don't think you have to go that far, no. And so then the only question becomes, is there enough evidence in this record in the light most favorable to the government for the jury to believe that these kind of words were, in fact, a threat to the witness? And so the only cases you've shown me are the ones where it's so clearly a threat. Do you have anything that's closer to the situation that you're trying to urge the court here? No, I haven't found any cases that really even deal with indirect threats. They all seem to be, in particular, direct threats. But I don't believe that you can take Baldiga and Victor and say that they somehow support the conviction here, just based on the facts that were there, where you did have the gun put to the head, the searching for the wire, the ripping the wire away in the Baldiga case. In the Victor case, you have a direct threat. He basically says, you're talking too much, and I've got another shot here, and it's for you. Isn't threat all about context? Isn't the jurisprudence of threat all about context? And doesn't it make a difference who it is? And if you've got a witness outside the courtroom sitting on a bench, ready to testify against John Gotti, and Sammy the Bull Gravano walks up and grabs that person's hand and says, I hope you keep your health for a long time, and walks off, I suspect that's a threat. I suspect that is. I suspect it's intended to keep that person off the stand. Yes, I would say that it is. But I don't think we have anything even close to that. Makes no difference that this is Kathy Brillen's live-in boyfriend? No. I mean, as far as that's concerned, they really weren't live-ins at that point. I mean, it had been an often- That's what I don't understand. She had been arrested by then, right? Yes. So you could bet that she was going to be – there could be some proceedings against her, right? Yes. He said to her that all the people who ratted on Kathy should be taken care of, too, and that they should be in ditches. And what else could he have meant? What would you have to do to connect that up to an intent to stop her from testifying? Why else would he be saying this? Well, there were some other things going on, but that type of thing, I think, certainly satisfies the first element. But then when you – You just told us before it didn't satisfy it. It may. I mean, I don't know that it does, but it certainly may satisfy the first element. But I don't think it satisfies the second element, particularly in light of the fact that what Kathy Brillen fled guilty to occurred back in July of 2001, and Tiffany Wadman could not be a witness to any of that because she never met this woman until August of 2001. It would in no way have impacted the Brillen case. But when did she plead guilty? She pled guilty about the same time that Mr. Gamba was indicted. But was it before or after these conversations, these threats? There was one conversation. That's the problem. I mean, Ms. Wadman wasn't real clear about when these conversations occurred. She said something happened in November of 2001, but she was never real clear about when these conversations occurred, where there was actually a comment made that the people that ratted on Kathy should be in ditches. Because she said that until November of 2001, there was nothing ever said that would even constitute a threat. You wanted to spend some time on the cross-appeal? Yes, I did. Thank you. We'll hear from the government at this time. Thank you, and good afternoon. Good afternoon. May it please the Court. My name is Bernie Hughley. I'm an assistant U.S. attorney from Helena, Montana. I appear here today on behalf of Josh Van DeWettering, who is on temporary leave of absence from our office teaching at the Montana Law School. Although I was not trial counsel, nor did I write the brief, I have read the record, and I've read the briefs, and I believe that I can thoroughly argue the case. First, the approach I would like to take in my argument, if I may, is to rebut the arguments of Mr. Sheehy with regard to count three, address the departure issue, and then address our argument with regard to count five. First of all, directing your attention to count three, Mr. Sheehy is right with regard to the two elements. Number one, we have to show that Gamba knowingly used intimidation against Ms. Wadman, and secondly, that he used that with the intent to delay or prevent testimony of Wadman against Breland. Now, let's dissect this down into the two elements, and let me speak of the first element in order. The intimidation is satisfied by threats, direct or indirect. I'm not aware of any distinction wherein a court has said that an indirect threat won't satisfy the element or the notion of intimidation. So consequently, I think that we need not dwell on whether this is an indirect or a direct threat. We only need to decide whether we do, in fact, have threatening and intimidating conduct and communication. With that in mind, I'd like to walk you through the record by pages and by sequence to substantiate the government's argument that there indeed was a threat here. First of all, with regard to the threats themselves, if you would refer to the excerpts of record at page 35 and 36, you'll see that the first instance is a direction by Mr. Gamba that if law enforcement comes asking questions, you don't know anything, which she clearly explained, I was not supposed to say anything. And this happens within a week of the Breland arrest, namely September 16, 2001. Then, directing your attention to the excerpt at page 38, the threats are repeated. And this, according to the testimony, occurs in the November time frame at both her house and at her work. And they are to the effect, all the people that ratted on Kathy should be taken care of. And as you've indicated, Judge Hawkins, the context is important. He was described as being angry by the witness. Then at page 39. How do we know the timing of these threats? I believe the record I have pulled out of the record that the first happened within a week, which would have been September 16th. It had to happen the last part of September. Then the repeated threats occur in November at both her house and at her work, according to the record. So I think we have the September, November time frame, which will become important based on some something that was asked of the court. Did it happen before she pled guilty? Well, I can tell you that if she pled guilty about the time Mr. Gamba was indicted, that it had to be, these threats had to be before, because Mr. Gamba was originally charged by complaint, if you look in the excerpts of record. And I just looked, as the question was asked, and the date on that is December 13. So these happen obviously before Gamba is charged. And if she pled guilty about the time he was indicted, they had to come before the change of plea. But getting back to my point, the first repeated threat was all the people that ratted on Kathy should be taken care of. Then at pages 39, 54, and 59, Mr. Gamba gives insight and explanation as to what he meant by being taken care of. They should be in ditches. They should be hurt and left in ditches. And then the most powerful one, I think, is everyone that had gone against her should have their faces cut, should be in ditches, should be taken care of. Now, I really don't see how anyone can argue that those kind of comments are not threatening in nature and how they can not be intimidating, because anyone that would hear those comments should certainly reasonably be put in fear of themselves. Now, with regard to the second element, a point was made that these threats certainly couldn't be interpreted as from the standpoint of having an intent to delay or prevent testimony. The threats were delivered in the first instance in the context of don't talk to law enforcement. Well, I mean, think that through. Don't talk to law enforcement so then they can't subpoena you and have you come to testify to what you know. I mean, it's literally crazy to interpret this any other way than the comments were designed to prevent testimony. Then suggesting that she should say nothing to law enforcement, I think, proves beyond all doubt that the comments we have to take in the context of preventing her from coming forward. Then keep in mind that all of these things were made under an umbrella of suspicion that she was an informant. Gamba told her, I've had you investigated. Well, a jury could logically infer that, well, for why? Was he trying to find out she was an informant? Did he have the suspicion of that? Well, of course he did. And then telling her not to talk and telling her that she would end up in a ditch is obviously a reference to keep her from testifying. And he's not talking about anybody. If law enforcement comes around, don't talk about anybody. He's talking about anybody that rolls on Kathy. The logical inference to be drawn from this is that he was trying to prevent the flow of information that would result in testimony against none other than Kathy Breland. Let me move, unless there are questions on that issue, let me move to the issue of departure, if I may. There are two bases, as I understand it, upon which the court departed. Number one was disparity in sentence. And I want to make sure, I'm assuming the court got Mr. Vander Wettering's 28J letter with regard to the standard of proof under the PROTECT Act. I think you review this anew rather than on the abuse of discretion. With that in mind, I think Caperna carries the day. There are two charges that are being compared here with regard to disparity in sentence. One is the obvious obstruction. The other is a drug violation. This Court has been clear since Caperna or in Caperna that you can't render a disparity adjustment downward when you have convictions on different crimes. So if we take that approach, it doesn't matter whether the PROTECT Act would apply or not. Is that right? Would we look at that as a legal issue? I think you're right. I think you're right that that's correct. Secondly, let's look at the fact of the matter. Where is the disparity? You're talking 27 months for the drug count, but somehow it's forgotten in here that the total was 70 months because of the drug gun count. And that the 33 to 41-month sentence potential for the obstruction, as a matter of fact, I think it's erroneous to find that there was even the potential of disparity. So from a factual standpoint and a legal standpoint, I think that there was an improper departure here. The second issue, the judge found that this situation was outside the heartland. And quite frankly, I can't come to grips with that nor agree with it because the guideline section applicable here, which is 2J, the background that we've cited, if I could just quote it to you for a minute, it says, Specific offense characteristics reflect the more serious forms of obstruction because the conduct, and here is the operative language, because the conduct covered by this guideline is frequently part of an effort to avoid punishment by the defendant or to assist another person. This situation is not outside the heartland of the guidelines. In fact, the heartland of the guidelines reflects both situations. And therefore, reliance on 5.20, the policy statement, and Kuhn, which allows departures outside the guidelines, can only apply if the situation was not contemplated by the guidelines and clearly by the express language of the guideline in question. And the background note, the conduct covered has been addressed, and the court for some reason clearly didn't recognize that. And I think that there is, at a minimum, an abuse of discretion, but that's not our standard. Reviewing it anew, looking at that guideline, I believe you've got to find that the departure was inappropriate. Did you want to talk about the cross appeal at all? That was the first issue on cross appeal. Okay. The second issue we have on cross appeal is we believe that the district court erred in rendering the post-verdict guilty, post-guilty verdict on count five, and dismissing that under Rule 29, because we believe that there was evidence that the jury relied on and that the jury's efforts were sound and appropriate and based on reasonable judgment and reasonable inference. Would you distinguish on that? It seems to me that there's reasonable inferences on the issue of drug use, and those are certainly punctuated in the record. What specifically is the evidence of knowledge with respect to dealing or intent to deal? I was struck when I read this record in preparation for this appeal by one fact that I just don't think we can walk around. Kathy Breland told Gamba that she was dealing drugs within the first year of her heavy usage. Now, if you reconstruct this record, that is approximately one to two years before this event. He kept asking her if he were using. The logical problem that I have is she told him she was a dealer. At what point, then, can he believe she's not a dealer? That's, you know, it's kind of the cosmic question, you know, once a dealer, always a dealer? Or how proximate in time does it have to be to this particular event in terms of the charge? Good point, but let me follow through with that. He tells her, and he knows that as of that time, she's a drug dealer by her own admission. They fight about it. He continues to ask her about her use. She denies it, and by everybody's testimony, he doesn't believe it. Then he gets charged with a drug trafficking crime. Now, he was at the arraignment. We've all been to arraignments, and we know that the defendant is advised of the nature of his charges. What's the record side on that? I wasn't sure how we knew he was at the arraignment. I know it was in the brief. If you look at, I believe, the testimony of, is it Jim Olson, the FBI agent, who talked to him at the court proceeding? I think that's where you go to. I thought that he talked to him in the hallway. Well, I guess if that's the case, I stand corrected, but I thought that he was at the court. I took it to be evidence. He was at the courthouse, but was he in the courtroom? I just wasn't sure we knew one way or the other. I understood the record to establish that he had attended the proceeding and became aware of the charges. But even so, he knows there are charges. Does he know that it happened? Well, he knows she's a drug dealer. Well, has been in the past a drug dealer. Right. He knows that she's admitted being a drug dealer. Then you bring it right up to the current date, and he finds out that she's charged with a drug trafficking crime. Which means she's innocent at that point. Absolutely. But charged. But charged and knows. And he made an accusation. All right. But let's continue with the flow here. He knows that she's been accused of a trafficking crime. And already knowing that she's admitted being a trafficker. Then, what does he do? He goes to the very person that supplied her. And he tells that person to fabricate testimony and take responsibility for what she's been charged with. And then, not only that, but he goes to, lo and behold, two of her customers. And he threatens, clearly by a jury verdict, one of them. And our position threatened another, but at least contacted her and, as Josh writes in his brief, threatened or cajoled them not to testify against Kathy. How did he know to go to her customers? These individuals were asked whether they had evidence or they knew whether he was actually aware she was dealing. Right? Right. What did they say? They knew that she was dealing because they were her customers. And they asked about what he knew, weren't they? Right. And their testimony was at best equivocal, wasn't it? Well, the one said that he was angry because of her use and everything and her dealing and whatnot. That was the first witness. What they were saying is he did not believe the fact that she was not yet still in the business the way I read the record. You can have a teenager in your house, your own child, that you suspect might be using drugs and you can cross-examine them. The government's own advertisements on television encourage you to do that and to constantly question and cross-examine and examine every denial. Is a parent assuming knowledge of drug use by being that vigilant? No, but I think there's more here. I understand what you're saying and I fully comprehend your point. But here you have him in the face of denial go to the actual people she supplied and to the very person that supplied her. I would like to know not in general that she's drug dealing even now, but that the particular crime of which she was convicted on that day she dealt whatever it was that she dealt. And I would bring you right to the point. How did he know to go to her supplier if he didn't know? And that's exactly who he went to. The question is, doesn't the law require that he have knowledge of the crime of which she's accused? Not general dealing, not a reputation for dealing, not suspicions of dealing, but that she engaged in drug dealing in most specific instances. That's troublesome because I look at our I look at the charge and it's we did charge her with possession with intent on September 16th. And possession with intent of a dealer amount to a different day. Right. Right. Let me get to that. She he had to he had to know something about that very charge because that charge contained saying had to know, should have known. How come he couldn't answer this question? And I have a problem with this. What's the government's proof that he was aware when she possessed those drugs on that day that she intended to distribute them? I think the best way I can answer that is the logical inference to be drawn from the fact that he went to the person that supplied her those drugs on that day. He knew that she had drugs on those days, but it doesn't know that she intended to deal them. But it was a dealer quantity of drugs from which I think the any the any. How did he know that? Well, I guess he went right to the dealer that gave them to her. And the dealer said it was X quantity. That's not in the record. That is not in the record. So he didn't there's no proof he knew what the quantity was? If there is, I can't recall it. Would you go back then and clarify the underlying crime that he needs knowledge of? What date? Well, I think I think that the inference that can be drawn with him going to the very supplier of the drugs she was charged with. That's my question. What is the date for which she is charged? September 16th, 2001. Okay. He went to the very supplier of her on that day. And asked that guy to take the rap for possession. To take responsibility for the drugs she had. To pay for his drugs. What proves to me he knew she had drugs. Right. But with intent to distribute? With the backdrop of her telling him that she was a drug dealer. I can't get over the logical hurdle of when do you stop believing that when she's charged with a drug trafficking crime and he goes right to her supplier. For a jury for beyond a reasonable doubt termination. That's the problem. I mean, otherwise everybody who's ever been dealt drugs ever dealt drugs. Everybody who dealt with them is supposed to know that forever. Right. But I think if you pigeonhole it, you're absolutely right. But if you put the totality of the circumstances together here, I think there's a reasonable inference because he went to the very supplier that he had to know that she was trafficking as he had told her in the past. Our questions have taken you over your time. Thank you very much for your argument. Thank you. Appreciate you coming in today. Mr. Sheehy. Thank you. Thank you. Let me just deal briefly with this question on the threats. And if you look at page 36 of our excerpts, which is Tiffany Vondman's testimony, she said threats were made to her in November. And she said it came up because he had gotten angry because they raided his house looking for a gun one time. And he thought that Pat Irving and I were the only ones that knew about this gun. And he thought that I had told the police about it. So I think even if you can find that there was a threat, it had more to do with him and this alleged gun and not Kathy Breland. So therefore, we would ask the court to overturn his conviction on count three. Now, if the court doesn't do that, then we have to address this question of the downward departure. And I guess there are two questions. One is, is it appropriate to depart downward based on sentencing disparity when there are two different crimes? What's your response to that? My response to that is that the court was not downwardly departing on sentence disparity because there were two different crimes. What the court said, if you look at the government's excerpt number three, and I believe it's page nine where it first said it, with regard to applying that cross-reference where the court accepted my argument that that cross-reference to accessory after the fact should not be applied, the court said that I think that when you get these kinds of offenses, witness tampering, the offense of conviction dictates the guideline range of the person who's accused and convicted of the tampering. The problem is that he's dealing with the initial indictment. She pleads to something else, which she has no control of, no knowledge of, and could not interfere with. And then the consequences of what she pleads to directly impact the guideline range of apply to him, which has nothing to do with the original actions for which he was convicted, which is this witness tampering. And the court went on to say that on page 20 and 21 where it discusses its reasons for downwardly departing and saying this is out of the heartland. On page 21, he talks about sentencing disparity that would result as also a factor that causes me to look at the situation and say that this is not the ordinary case where the witness tampering is for an offense she didn't plead to. That's what concerned the Court with regard to disparity is this same issue that this Court has been asking about with regard to Count 5, is that the witness tampering had to do with what occurred in September of 2001 and nothing to do with what she pled guilty to. That's why the Court didn't do it. Well, I think it does matter because the Court did not apply the cross-reference, because the Court bought my legal argument that that cross-reference should not be applied because of the fact that there were these two different dates. The government has not appealed that. So you have a benefit from that, presumably a lower sentence than you would have had otherwise. So how does that help on this disparity question? Well, because the Court, again, looked at that by saying, okay, we do the guideline without that cross-reference. That gets us a guideline calculation of level 20. The Court then says that because of the fact that we have a witness tampering conviction pertaining to something other than what the person he's supposed to be trying to assess pleads guilty to, that's how he's discussing sentencing disparity. But basically he's saying, look, she didn't plead for that. She pleads to something else. Gets her in not a bad position overall relative to him. But doesn't that all boil down to you've got two different crimes at issue here and we're back to the Coperna case? Well, the problem there, though, is that the government itself conceded at sentencing that there may be sentence disparity here and did not make the argument they've now tried to make on appeal that the Court could not look at sentencing disparity. I mean, that argument was not raised to the district court. The judge properly applied the guidelines to begin with, right? Yes. And doing so, he came up with a sentence that was higher for him than it was for her, right? That's your problem. Well, it depends on how you look at it. It depends on how you look at it, yes. It's not a much larger sentence, but you want to split it up. But on this issue, for this sub-issue. Right. But it's perfectly possible, of course, that the guidelines are set up that way. Somebody has decided that it's worse to tamper with witnesses, even on a smaller crime, than to do the crime. Well, but that gets you back to that background note, which talks about applying the accessory after the fact. And in this particular case, the Court did not apply that. I mean, it just took the level 12, which is the starting level, and then did the 8-level enhancement for the fact that there was this threat, which got you to the level 20. The Court then went down to a level 10 because it said, and it sets it out in detail on pages 20 and 21 of why it was doing that, that he had listened to all of the testimony. And this is not an ordinary case where people are trying to protect their own interests about something. You can't say that Mr. Gambo was trying to protect his own interest in some drug dealing or something because he was never involved in it. And the Court discussed that, yes, you can have witness tampering by people that are not directly charged with the offense, but it said that there was nothing that Mr. Gambo had to gain here. That generally is what you're looking at in the Heartland cases, is someone is doing tampering because they somehow are connected, say, in a conspiracy or something like that. We don't have that here. I guess that leaves me totally scratched in my head. If you're only going to get – that means that everybody is free to be outside the Heartland as long as they're not going to get a personal gain out of the tampering? I mean, is that the rule that would come out of this? No, I don't think that's the rule that comes out of this. I think that it becomes an individual case determination on the circumstances of the case. But, I mean, that's – in essence, that's what witness tampering is, whether it's for yourself or for somebody else. It's to try to basically swing the case. And I don't understand why 2J1.2 just doesn't apply straight up here. I mean, you're assuming the judge was right in not adopting it because he didn't adopt the cross-reference. I don't know why that commentary is inapplicable here from a legal standpoint. Maybe I'm missing something. I believe I addressed that in my responsive brief. I thought you said because he didn't apply the cross-reference that the commentary sort of didn't apply either. That's right. And I guess I'm just telling you so you can help me out. I don't understand that argument. Well, because I think the commentary is discussing that particular cross-reference. I mean, it's saying that that's how we deal with these situations where it's a very serious criminal offense, and that we apply that cross-reference. But the Court here found legally that that cross-reference should not apply. And that's why it is our position that the Court then could consider these other factors that take it outside the heartland. In particular, the Court was talking about how Mr. Gamba seems to be motivated to try to help people. Now I have your argument in mind. Thank you. And the Court, I think, went through a substantial discussion on pages 20 and 21 of the excerpts, the government's excerpts, as to why it found this to be outside the heartland. And it's not just because of sentencing disparity. It's because of the facts of this particular case that the Court found it atypical. And it's for that reason that we would ask the Court to affirm the sentence and reject the government's argument about downward departure. Very well. Thank you very much for your argument. Thank both counsel for their arguments. The case just argued will be submitted for decision, and the Court will stand in recess for the day. All rise.
judges: Hawkins, McKeown, Berzon